MOELLER ET AL., APPELLANTS, *v.* BOEKE, APPELLEE.

(No. 218—Decided February 16, 1966.)

*Mr. Lee R. Dabbelt* and *Mr. Robert D. Touvelle,* for appellants.

*Messrs. Garmhausen, Kerrigan & Elsass,* for appellee.

YOUNGER, P. J. This action originated in the Common Pleas Court on a petition for a temporary restraining order to enjoin the defendant from violating certain provisions of a written agreement, which agreement is as follows:

"New Bremen, Ohio
April 11, 1958.

"AGREEMENT

"Virgil Boeke of Minster, Ohio is purchasing the Route of Earl Moorman of Chickasaw, Ohio, for the amount of $3600.

"Richard Moeller, Art Moeller, Gene Schmiesing, and Mrs. A. J. Gels & Sons agree to reimburse Virgil Boeke at the rate of 50c per lb. per day on the Lima can shippers which are Virgil Boeke's patrons. The established rate is figured on an average yearly poundage. This will be paid as soon as they receive the milk on the truck.

"Virgil Boeke shall also be reimbursed for the first three months on the interest paid on $3600. The parties agree to pay in proportion to the amount of poundage received. These shippers who convert to Bulk shall go on the bulk trucks owned and operated by Richard Moeller, Art Moeller, Gene Schmiesing, and Mrs. A. J. Gels & Sons. These conversions shall be made to who's territory this patron falls in.

"All parties agree to accept Virgil Boeke's patrons until their trucks are fully loaded.

"This agreement guarantees all parties an equitable distribution of the milk and also territorial rights.

"Virgil Boeke waivers his rights, in so far as starting a bulk route.

"If any changes are made as to later ownership, this agreement stays in effect as of today.

"This agreement is in effect as of April 11, 1958." (Signed and Notarized.)

The record discloses that at the hearing the plaintiffs called the defendant for cross-examination and introduced the agreement and the testimony of two of the plaintiffs who were both cross-examined by defendant's counsel.

It was stipulated that the third plaintiff, if called, would testify substantially to the same facts concerning which the other two plaintiffs had testified.

The defendant, although present and represented by counsel, offered no evidence.

At the conclusion of the hearing, the court found that the motion for temporary injunction should be denied for the following reasons:

"1. The terms of the agreement are too indefinite as to their meaning insofar as they refer to the defendant. 2. The effective time and duration of the contract are too indefinite. 3. The territorial limits are too indefinite."

A motion for a permanent injunction was denied, the petition was dismissed and costs were assessed against the plaintiffs. Hence, this appeal.

It is quite apparent from the written agreement executed by the parties to this controversy that its author lacked the technical skill and elegance of expression which its importance to the parties should have required. At best it is only a memorandum or a skeleton. It makes no attempt to define or explain the full import of the words or expressions used. The record shows that the parties were experienced in the milk hauling business. They knew what a milk route was. It was nothing mysterious or ephemeral to them. They knew that milk routes are bought and sold regularly in the due course of business and that milk routes may vary from week to week as some farmers along the route increase or decrease their herds, or some decide to get out of the milk business while others decide to get in.

Consequently, the court properly admitted the oral testimony of the parties, not for the purpose of varying the terms of the written agreement, but rather, as stated in 21 Ohio Jurisprudence 2d 686, Evidence, Section 663:

" * * *, extrinsic parol evidence is always admissible to give effect to a written instrument by applying it to its proper subject matter, by proving the circumstances under which it was made, *thereby enabling the court to put itself in the place of the parties, with all the information possessed by them, the better to understand the terms employed in the contract, and to arrive at their intention, and the object sought to be accomplished by the parties.* And great latitude should be allowed in this respect." (Emphasis added.)

The record discloses that the defendant, on cross-examination, made the following admissions: That he had purchased the Earl Moorman route for $3,600; that he did not own a bulk delivery tank truck; that the route had seventeen shippers; that Ernie Springer, Bill Summers, Martin Harbocker and one other not originally on the Moorman route converted to bulk shipment; that, later, two others converted; that he got paid what he thought was coming to him under the agreement for four of the customers; that he had not been paid for

two; and that he has now started a bulk tank route over the old Moorman route and was trying to get business from the bulk shippers along the route.

The plaintiff Richard Moeller testified that after taking over the route some customers converted to bulk and defendant sent plaintiffs a bill based upon the price specified in the written agreement, which they paid for as follows:

| June | 7 - 1958 | Jim Hehr | $267.50 |
|---|---|---|---|
| Feb. | 19 - 1959 | Jim Gorbolden | 200.00 |
| Oct. | 12 - 1960 | Ivan Springer | 352.00 |
| Nov. | 29 - 1962 | Horbecker & Summer | 805.50 |
| Dec. | 31 - 1962 | Ernie Springer | 447.50 |
| | | Total | $2072.50 |

He also testified that plaintiffs paid the defendant $12 interest as required.

He testified further that there was a growing tendency upon the part of both farmers and haulers to transfer from can to bulk handling of milk; that it was handier for both and less hard work; that it costs a hauler ten thousand dollars to equip himself with a bulk tank truck and that the defendant said he could not afford a tank truck; that the Moorman route supplied 8,000 pounds of milk per day and that if all customers on the route converted to bulk the defendant would get back around $4,000, based on fifty cents per pound of the daily average, and not lose any money on his purchase of the route, but if plaintiffs did not agree to pick up the bulk patrons' milk and pay him for it he would lose money if the patrons on the route converted; that the Moorman route was about fifteen miles long and was located around Bern, Indiana, which is just across the state line between Ohio and Indiana; that Jim Hehr was not an original Moorman route patron but lived close to it in Ohio and that when he converted to bulk the defendant sent plaintiffs a bill claiming this was covered by the agreement (being close by or along the Moorman route) to which plaintiffs agreed and paid defendant $267.50; that defendant was now picking up the milk from Jim Hehr for which plaintiffs had paid him and was attempting to get back other customers on the route who had converted; and that defendant is now transporting

milk in bulk tank from shippers on the Moorman route, namely, the following: Eddie Van Guten, Dan Striker, Ben Maslin, Elmer Beer, LeRoy Layman and a Mr. Swartz, as well as Jim Hehr, for whom plaintiffs paid and defendant accepted $267.50.

The other plaintiff, Arthur Moeller, corroborated this testimony in many respects, although his testimony reveals he was more familiar with the bookkeeping and office than he was with the operations on the route.

However, Arthur Moeller did clear up a matter of importance in this case, as shown by the following testimony taken from the record:

"Q. Now, you knew at the time, did you not, that Mr. Boeke was purchasing this so called Earl Moorman route? Yes.

"Q. And, did you at that time know where that route was located? A. Yes.

"Q. Will you please state its general location? A. Well, it included around the Bern area and then when this agreement was written up it was to state all of the Bern area or the Moorman territory rights plus the stops that Verg had on his route at the present time.

"Q. Now, I don't know that I got that straight. Did I understand you to say that this agreement was to cover the Moorman area? A. Yes.

"Q. And, including such stops as Moorman had at that time? A. Right. What he had at that time we was to pay for as well as around the Bern area.

"Q. Well, then, it is your statement any other producers that were picked up in that area if they converted to bulk, you were to take that? A. In the Bern area, right.

From this uncontradicted testimony, together with that of Arthur Moeller's brother, it is clear that the so-called Moorman route as mentioned in the written agreement included more than 15 miles of certain specified roads and more than the 17 customers that Moorman had at the time of sale. It included a small area. As shown by the testimony in this case, the so-called Moorman route had a potential and did expand in the area in which it operated and in the number of shipping customers.

The actual miles or roads traveled and the number of actual shipping customers at the time of sale are not limited, either

by the written agreement or by custom and usage, but, as shown by the evidence, include the possible expansion of the route to which both parties hereto had knowledge at the time the written agreement was entered into.

This testimony is uncontroverted in the record.

The prayer of the petition is that a restraining order be issued enjoining the defendant from soliciting the customers of plaintiffs for their bulk milk shipment and from transporting the bulk shipments of the shippers of milk whose businesses have been and will be sold by defendant. The evidence clearly identifies those whose businesses have been sold, that is those on the route who have converted to bulk, for which the defendant sent a bill and for which plaintiffs have paid—and those that will be sold, that is, those on the route, who might convert and which defendant agreed to sell to plaintiffs under his agreement for 50 cents per pound for the average daily amount produced by each customer so converting.

The Common Pleas Court, from its reasons assigned, disregarded the prayer of the petition, disregarded or failed to comprehend the significance of the evidence adduced, looked solely to the agreement, regarded the action only as one for specific performance and found that *"the terms of the agreement* are too indefinite."  (Emphasis added.)

While it is true that an injunction against the breach of a contract and the specific performance thereof are interdependent remedies, it is also true that, where an injunction against the breach of a negative covenant of an agreement will do justice as between the parties, it should be issued notwithstanding the fact that specific performance cannot be had.

"Injunction against the breach of a contract, and specific performance of a contract, are interdependent remedies. An injunction restraining the breach of a contract or of a specific wrong is, in effect, negative enforcement of that contract, and if the contract is one of the class which can be affirmatively and specifically enforced, equity will restrain its breach by injunction, if this is a more practical means of enforcement. Further, injunction may be granted against the commission of a particular act in order to compel specific performance of the entire contract.

"In the ordinary case, injunction is directed against the

breach of negative covenants in the contract, and the fact that specific performance of the contract in question cannot be had is not an insuperable objection to injunction against the breach thereof." 29 Ohio Jurisprudence 2d 270, Injunctions, Section 79.

The following citation is also quite applicable here:

"The principle of equity jurisprudence—that when a court of equity acquires jurisdiction for the purpose of giving equitable relief it may give full relief although this may involve the determination of legal issues and the granting of legal remedies —is fully applicable to injunction cases. In this respect, a court of equity, once having acquired jurisdiction of a controversy, will retain jurisdiction in order to provide present relief and do complete justice between the parties. * * *
"* * *

"Where the breach of a contract is threatened, the court may, in a proper case, issue both an injunction and specific performance. Where the relief sought in an action is in the nature of broad equitable relief although the specific prayer is for injunction, the court may grant specific performance if it finds it necessary to do so before granting the injunction asked for." 29 Ohio Jurisprudence 2d 415, Injunctions, Section 183.

The picture in this case is clear. The defendant, a can milk hauler, had purchased or contracted to purchase a milk route, the patrons on which were can shippers  The plaintiffs were bulk milk haulers fully equipped. Both parties knew of the very marked trend in the milk business for both farmers and haulers to convert from cans to bulk tanks in handling milk. The large number of conversions on this small route from the date of the agreement, April 11, 1958, to the filing of the petition, January 8, 1964, shows the strength of this trend. The agreement entered into was to the mutual advantage of both parties. It permitted the plaintiffs to increase their business and it provided that the defendant would be paid for the business which—but for the agreement—he would otherwise lose without recompense.

The interpretations of this agreement as placed upon it by the parties themselves for a period of over four and a half years of operation show that as to them it was clear and definite. Both parties knew when a farmer converted from can

to bulk. The defendant traveled this route every day, as milk in cans must be hauled daily and empty cans left for the next day's milk. The plaintiffs—or the driver—traveled the route every other day, as milk for bulk delivery is placed in the farmers bulk tank, held at 40 degrees temperature and picked up by the haulers bulk tank every other day. Both parties knew, or had the means of knowing from the records kept, the average daily production of the farmer converting to bulk. Both parties knew, therefore, when a farmer converted, the exact number of dollars the defendant had coming and the plaintiffs owed on the individual transactions involved. No dispute over any of these matters appears from the record.

However, as the number of farmers converting to bulk increased and those remaining on can delivery decreased, the defendant provided himself with a bulk truck and started hauling bulk milk from those farmers, which, under the agreement, he had agreed to sell to plaintiffs. In our opinion the section in the agreement whereby the defendant "waivers his rights, in so far as starting a bulk route" is not as important as his agreement to sell upon conversion and accept a specified price. It was only when the defendant realized that it would be to his financial benefit to obtain a bulk tank and haul the milk himself that he failed to send a bill to plaintiffs when a patron converted and, in violation of his agreement to accept a certain price, went in and attempted to get the business and hold it for himself.

Over a period of four and a half years the defendant sent the plaintiffs statements on five shippers who had converted and, in effect, said we have a distinct and definite agreement under which you owe me $2,072.50.

The defendant now comes into court and admits on cross-examination that he is violating the agreement and now says, in effect, to the plaintiffs, the agreement under which I collected $2,072.50 from you and which I wanted you to sign to save me from a possible loss on the $3,600 I paid for the route is too indefinite and I am, therefore, released.

The plaintiffs have, under this record, proved their case by the parol evidence which makes the total agreement of the parties definite and specific enough to support a judgment and a permanent restraining order.

A permanent restraining order will be granted in the same form as the temporary restraining order previously issued by the trial court.

*Judgment accordingly.*

HOVER, J., concurs.

GUERNSEY, J., dissenting. This appeal was perfected as an appeal on questions of law and fact but, because the appellate court has little control over the submission thereof, presents an unusually strong argument for the discontinuance of such appeals.

Under the provisions of Section 2505.21, Revised Code, such an appeal "entitles the party to a hearing and determination of the facts de novo which shall be upon the same or amended pleadings," and "upon such part of the record made in the trial court as any party may present to the [appellate] court and such additional evidence as upon application in the interest of justice the court may authorize to be taken." Pursuant to this statute, and rules of court, plaintiffs, appellants herein, elected to present the complete transcript of the evidence admitted in the trial court, and there was no objection thereto nor was any application filed by the defendant, appellee herein, to present any additional evidence. At the time the appeal was assigned for hearing on its merits neither the parties nor their counsel appeared and no additional pleadings, stipulations or motions were filed in this court with reference to the submission of the case upon appeal.

However, an examination of the record discloses that the petition prays for an injunction to enjoin "defendant from transporting the bulk shipment of the shippers of milk whose businesses have been and will be sold by defendant," and purports to be based upon the provisions of an alleged contract entered into and existing by and between the defendant, the plaintiffs and a certain "Mrs. A. J. Gels & Sons," the latter not being a party to the action. An examination of the transcript shows that the evidence therein was received by the Common Pleas Court at a hearing for a temporary injunction and consists of the plaintiffs' evidence only, there being no evidence

offered by defendant. The transcript does not show whether the defendant rested but recites at the conclusion of the plaintiffs' evidence that the prayer for a temporary injunction should be denied. There is nothing further in the record as to any hearing on the issuance of a permanent injunction except the following, which appears in the judgment denying same and dismissing the petition, from which judgment this appeal is taken:

"Thereupon, counsel for plaintiffs, having stated to the court that in view of their conviction that the evidence offered by the plaintiffs at the hearing of their motion for a temporary injunction, and admitted in evidence herein by the court, * * * was sufficient to prove the facts stated in the petition herein, the plaintiffs did not desire to offer additional evidence, and were moving for final judgment against the defendant, and for a permanent injunction, restraining the defendant as prayed in petition, and were offering in evidence the written transcript of said testimony and said exhibit in support of said motion."

It further appears from the record that no answer to the petition has ever been filed by the defendant and that when judgment was entered the time for filing same in the Common Pleas Court had long expired; and there is nothing in the record to show any participation by the defendant in the submission indicated by the foregoing quotation.

As an appeal on questions of law and fact, if one lies here, entitles the parties to a trial *de novo* on the transcript of the evidence heard in the trial court and such additional evidence as may be authorized to be taken in the interest of justice, and as the defendant has neither objected to the transcript of evidence filed herein nor requested the admission of additional evidence, we must presume that he is agreeable to the submission of this appeal on such evidence as is included in the transcript. However, no answer was filed in the trial court and none in this court, and the defendant is, therefore, in default for answer. A default judgment may be taken against a defendant in an injunction action as well as it may be taken in an action for money only. In taking such default judgment, however, it is discretionary with the trial court to require proof before entering such judgment. 43 Corpus Juris Secundum 946, Injunctions, Section 221; and 31 Ohio Jurisprudence 2d 645, 648, Judgments, Sections 190, 193. If the proof submitted fails to support the

allegations of the petition or fails to prove a cause of action a default judgment must, of course, be denied.

The cause of action which the plaintiffs attempt to allege and prove herein, although sounding in injunction, is basically an attempt to require the defendant to specifically perform the contract offered in evidence.

It is stated in 81 Corpus Juris Secundum 480, Specific Performance, Section 31:

"In order to warrant a decree of specific performance thereof, a contract must be definite and certain, and, further, a contract must be free from doubt, and vagueness, as well as from ambiguity, in its essential elements and in all, or at least all its material, terms. Clearness is required. The terms of the contract must be so clear, definite, certain, and precise, and free from obscurity or self-contradiction, that neither party can reasonably misunderstand them, and the court can understand and interpret them, without conjecture and without supplying anything or supplanting vague and indefinite terms by clear and definite ones through forced or strained construction. The terms must be so clear that the court can determine what the contract is and be able to require that the specific thing agreed to be done shall be done. * * *"

I have carefully reviewed the provisions of the contract herein and am of the opinion, as was the Common Pleas Judge, that the same is not sufficiently clear, definite, and certain, to warrant a decree requiring the specific performance thereof, and conclude, therefore, that the petition of the plaintiffs should be dismissed.

If there should be any doubt as to whether such a trial was had on issues of fact by the Common Pleas Court as would authorize consideration of this appeal on questions of both law and fact (*LeMaistre, Admr.,* v. *Clark,* 142 Ohio St. 1), I am convinced that such doubt would not be significant, for had this appeal been heard on questions of law only, it is my opinion that we would have been required to find for the defendant as a matter of law.

In conclusion, it should be observed that if all the things are read into this contract which my associates claim should be, but which this author is convinced are not justified by the record, specific performance or injunction, as claimed here,

would be in the enforcement of provisions thereof in restraint of competition. However, it is basic that a contract in restraint of trade is contrary to public policy and void and a breach thereof will not be enjoined unless the operation of the covenant in restraint of trade is reasonably restricted as to both time and space. 43 Corpus Juris Secundum 564, Injunctions, Section 84. It could be variously claimed, on the basis of the indefinite provisions in this contract, that the restraint applies (1) with respect to only the former customers of Earl Moorman, (2) with respect to any existing or potential customers in the area of the Earl Moorman route, or (3) with respect to bulk tank customers wherever Virgil Boeke might choose to operate; and validity would depend upon which interpretation should be adopted. An agreement such as this, which does not specify the period of time during which the restraint applies, may be enforced only for a reasonable time. This agreement was executed on April 11, 1958, and more than 7½ years have passed; and, in my opinion, even if enforceable as to space, it is no longer enforceable as to time. 17 Corpus Juris Secundum 1114 *et seq.*, Contracts, Section 242 *et seq.* Finally, the record is clear that defendant, Boeke, is not hauling milk from any customers "transferred" to the plaintiffs under the contract and for which he has been paid by plaintiffs, nor is he serving any customers formerly served by plaintiffs. If the evidence supports any inference, or conclusion, as to his activities with relation to former Moorman customers, the most he is guilty of is unsuccessful solicitation. Without considering any right which the plaintiffs may have in an action at law for damages, it does not clearly appear that plaintiffs have suffered, or will suffer, irreparable injury entitling them to equitable relief.

HOVER, J., of the First Appellate District, sitting by designation in the Third Appellate District.